UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:20-CR-291 |
| v. | : | (JUDGE MANNION) |
| ROBERT JACKSON, | : | |
| Defendant | : | |

### MEMORANDUM

Pending before the court is defendant Robert Jackson's motion to suppress statements pursuant to Fed.R.Crim.P. 12(b). The statements were made after he was arrested by an officer with the Pocono Mountain Regional Police, ("PMRP"), and a detective with the Monroe County District Attorney's Office. (Doc. 27). Jackson is charged with a drug trafficking conspiracy and distribution of a controlled substance resulting in death. Jackson seeks the court to suppress his incriminating statements alleging that they were obtained unlawfully after he invoked his Miranda rights. Jackson contends that all of his statements should be suppressed since he was in custody and being interrogated, and since officers continued to question him after he "reserve[d] all of [his] rights" and, claimed that he was "kidnapped" and being held "under threat, duress, and coercion."

For the reasons discussed below, and after consideration of the briefs and the evidence submitted, including the video recording of the statements,

Jackson's suppression motion will be **DENIED IN ITS ENTIRETY** without the need for an evidentiary hearing.

I. **FACTUAL AND PROCEDURAL BACKGROUND**[1]

As a backdrop, on July 28, 2020, the PMRP were dispatched to 1220 Little Billy Lane in Tobyhanna, Pennsylvania for an unresponsive male found in a gutted dwelling on the property. The male was identified as Joseph Sturgis, Jr. Sturgis's cell phone was located near his body, along with a hypodermic needle and multiple small wax bags consistent with heroin use. A forensic examination of Sturgis's cell phone revealed relevant text messages and Facebook communications between Sturgis and two female family members. The details of the conversations between Sturgis and the two females included the purchasing of two bundles of heroin for $150.00.

The two female family members were interviewed by officers at the scene about their communications with Sturgis prior to his death. They admitted that their contact for heroin was a guy they knew as "Jay" from Scranton, who was later identified as Robert Jackson. The females stated that they would typically text "Jay" to obtain heroin. Working with the officers,

---

[1] For present purposes, the court utilizes portions of the factual background as stated in the government's opposition brief, (Doc. 32 at 1-5), as well as Jackson's audio and visually recorded interview conducted on July 28, 2020, which was submitted by the government on a CD disc as "Att. A" to its brief. (Doc. 32). The court also relies upon portions of the transcribed interview which Jackson submitted with his brief, (Doc. 28-1). The court notes that Jackson did not contest the factual background stated in the government's brief or offer an elaboration of the facts by filing a reply brief.

the two females communicated with "Jay" to order additional heroin that evening. "Jay" agreed to meet the females and replied in a text message that he would arrive at their location in Tobyhanna in approximately 26 minutes. Officers set up a perimeter and observed "Jay" arrive as he had stated he would. "Jay" was immediately ordered out of his vehicle by officers. As "Jay" exited the vehicle, he dropped his cell phone and two bundles of heroin stamped "Dirty Harry" at his feet. Officers called "Jay's" cell phone number that was provided by the females and the cell phone that "Jay" had dropped rang. "Jay" was placed under arrest and identified himself as Robert Jackson. He also claimed to be "sovereign citizen" and a "Moorish American National."

Jackson was taken into police custody and transported to the PMRP Headquarters where he was given his Miranda rights and asked to speak with officers. The details of Jackson's interview that are at issue in his instant motion will be discussed below.

A search subsequently executed by officers at the Tobyhanna property resulted in the seizure of a bundle of suspected heroin located in the front pants pocket of Sturgis. The bags in the bundle were stamped "Dirty Harry." Also seized were multiple empty wax bags stamped "Dirty Harry." An autopsy and toxicology determined the cause of Sturgis's death to be a fentanyl overdose. PSP laboratory analysis of the "Dirty Harry" bags showed that they contained fentanyl.

On November 17, 2020, a grand jury returned a three count indictment charging Jackson with conspiracy to distribute controlled substances, in

3

violation of 21 U.S.C. §846, distribution of a controlled substance resulting in death, in violation of 21 U.S.C. §841(a)(1), and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(C) and 18 U.S.C. §2. (Doc. 1).

On November 19, 2020, Jackson had an initial appearance before Chief Magistrate Judge Mehalchick, and he entered a not guilty plea. He was ordered detained in the Lackawanna County Prison ("LCP"). (Docs. 12 & 14).

On April 12, 2021, Jackson filed, through his appointed counsel, his motion to suppress his statements and supporting brief alleging that his statements to the officer and detective on July 28, 2020 were made after he invoked his Miranda rights to cease the interview. (Docs. 27 & 28). Jackson attached as an Exhibit to his brief a copy of selected portions of the transcript from his recorded interview. (Doc. 28-1).

On May 24, 2021, after being granted an extension of time, the government filed its brief in opposition to Jackson's motion to suppress statements with a CD disc containing the entire video recording of Jackson's complete interview. (Doc. 32).

## II.    LEGAL STANDARD FOR SUPPRESSION MOTION

In U.S. v. Sater, 477 F.Supp.3d 372, 379 (M.D. Pa. 2020), the court discussed a defendant's 5th Amendment rights in the context of a suppression motion and stated:

> The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" Pennsylvania v. Muniz, 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed. 2d 528 (1990) (quoting Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966)). To ensure a person's Fifth Amendment rights are protected, Miranda held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444, 86 S.Ct. 1602.

Here, Jackson argues that his post-*Miranda* incriminating statements to the officers were made after he invoked his right to remain silent and stop the interview, and contends that they should all be suppressed.

In U.S. v. Whiteford, 676 F.3d 348, 362 (3d Cir. 2012), the Third Circuit explained:

> The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2262 (2010). A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986).

In United States v. Hodge, 2017 WL 1345219, *13 (D.V.I. Feb. 24, 2017), the court discussed a waiver of rights and stated:

> To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the

totality of circumstances surrounding [the defendant's] statement." Briscoe, 69 F. Supp. 2d at 741 (quoting United States v. Tyler, 164 F.3d 150, 158 (3d Cir. 1998)) (quotations omitted). Courts also must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." Id. (citing Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983)) (internal citations omitted). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, the defendant's physical and mental state, and other pressures affecting the defendant's powers of resistance and self-control. Id. at 741 n.1. "Miranda rights will be deemed waived only where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir. 1996) (quoting Alston v. Redman, 34 F.3d 1237, 1253 (3d Cir. 1994)).

### III. DISCUSSION

This court has jurisdiction over Jackson's motion to suppress under 18 U.S.C. § 3231.

The government has the burden of proving, by a preponderance of the evidence, that Jackson's statements made during his interview were voluntary. *See* Sater, 477 F.Supp. 3d at 383. If the government fails to meet its burden, the defendant's involuntary statements are not admissible in evidence for any purpose. "Due process requires a suspect's confession to be voluntary if it is to be admitted into evidence", and "[a] confession is involuntary if the suspect's will was overborne in such a way as to render his confession the product of coercion." *Id*. at 384 (internal citations omitted). Additionally, "[i]t is well established that an involuntary confession may result from psychological, as well as physical, coercion", Miller v. Fenton, 796 F.2d

598, 603 (3d Cir. 1986), and "[t]he question in each case is whether the defendant's will was overborne when he confessed." *Id.* at 604. The court considers, in part, "the specific tactics utilized by the police in eliciting the admissions," and "the details of the interrogation" in determining whether the officer's statements and actions, as well as the conditions, were so coercive that they deprived the defendant of "his ability to make an unconstrained, autonomous decision to confess." Miller, 796 F.2d at 604.

Jackson moves to suppress his incriminating alleged post-invocation statements under the 5th Amendment with respect to his interview at PRMP Headquarters. No doubt that Jackson was in custody at the time in question after his arrest and that he was read his Miranda rights by Scarfo prior to his interview. In particular, before his interview began, Jackson was advised that he was being audio and visually recorded. He was then advised of his Miranda rights, which were read to him from a written form by Scarfo. Jackson was advised that if he chose to speak to officers, he could stop the questioning at any time and exercise any of his Miranda rights. Jackson was then asked if was willing to speak to officers about why he was in custody. Jackson then made ambiguous statements regarding his preservation of rights as a "Moorish American National." [2] He stated that he did not

---

[2] The court notes that any claim by Jackson that this court lacks personal jurisdiction over him as a "Moorish American National" or that his alleged heritage has any relevance in this case with respect to the criminal proceedings is "frivolous." *See* Ibrahim v. N.J. Office of Atty. Gen., --- Fed.Appx.---, 2021 WL 3012670, *2 (3d Cir. 2021) (citing United States v. Benabe, 654 F.3d 753, 767 (7th Cir. 2011) (explaining that a person claiming

understand why he had been "kidnapped" and that he wanted to "reserve all my rights" because, "I'm only here under threat, duress and coercion." Scarfo responded by stating, "I don't really know what that means." Scarfo asked Jackson if he had any questions for him, to which Jackson said, "I don't understand why I'm here," and "If I'm here against my will, I've obviously been kidnapped." Scarfo then asked Jackson if he understood his Miranda rights and whether he would like to look at a written copy of them, i.e., to read them for himself. Jackson responded, "No. I understand them" and indicated that he could read, write and understand English. Scarfo then asked, "[d]oes that mean you want to speak to us in regard to why you're in custody or you do not want to speak to us while you're in custody." The second officer in the interview (Orlando) then advised Jackson that before he answered that question, he wanted to tell him [Jackson] that he was under arrest; that they wanted to get Jackson's side of the story; and wanted to "find out the truth." Jackson claimed that he was unlawfully arrested in violation of his

---

to be a "sovereign citizen" is "not beyond the jurisdiction of the courts," and that "[t]hese theories should be rejected summarily, however they are presented"); cf. United States v. Anzaldi, 800 F.3d 872, 878 (7th Cir. 2015) (discussing "sovereign citizen" and "Moorish national" claims). *See also* Weese v. Maryland, 2017 WL 8780880, at *1 (D. Md. Dec. 8, 2017) (holding that "the American Moorish and Sovereign Citizen movements, [] have [all] been uniformly rejected as legally frivolous by this and other Courts across the country." (string citations omitted). "So-called sovereign citizens believe that they are not subject to government authority and employ various tactics in an attempt to, among other things, avoid paying taxes, extinguish debts, and derail criminal proceedings." Weese, 2017 WL 8780880, at *1 n. 3 (quoting Gravatt v. United States, 100 Fed. Cl. 279, 282 (2011)).

constitutional rights since officers arrested him without an arrest warrant. He also claimed that officers needed a search warrant to search the car he drove to the Tobyhanna house. Jackson was then asked if he would help the officers find "a couple [missing] pieces of this puzzle." Jackson then responded, "I'm not one-hundred percent sure" [if he could do that] but stated that all he could do was to "speak my truth." Jackson also stated, "And reserve you know what I mean just as you know my rights is reserved." Orlando then stated that "we read you your Miranda rights." Jackson then stated that, "I, as a Moorish American National reserve all my rights and I'm here under threat, duress and coercion. However, if I can be of, you know, whatever the questions, and I don't know the questions....." Orlando then indicated to Jackson that he had been provided his Miranda rights and that "[t]here's the waiver of the rights which allow you to at any point in our conversation invoke those rights and not speak to us. If you don't feel like saying something you don't have to say it." Jackson stated "Ok", and indicated that he understood what Orlando was saying. Orlando repeated to Jackson, "So you can talk to us if you'd like to until you don't want to and then you don't have to." Jackson was then asked if he was willing to do that. Jackson indicated that he was willing to talk but he would not sign the waiver of Miranda rights until, "after we finish." Jackson then repeated, "after we finish." Orlando then stated that "[s]o verbally you're saying its ok [to talk] and later you'll sign [the Miranda waiver]." Jackson replied that "I don't want to

9

autograph nothing." Orlando then assured him that "You don't have to sign it this time ... we can still talk."[3]

Jackson then made incriminating statements to the officers, including statements with respect to his delivery and sale of "party favors", which he indicated was "heroin", to the two stated females who were the sisters of Sturgis, namely, Heather and Tori, who in turn gave the drugs to Sturgis. Jackson also admitted that he was at the Tobyhanna house before and that he provided "party favors" to the sisters in the past. Jackson stated that he obtains his drugs from wherever he can and that he can get them in "any hood." On the day in question, Jackson stated he got about a bundle of heroin, consisting of 10 bags of heroin marked "Dirty Harry", from someone in an alleyway in Scranton, PA, and then was delivering the bundle to the females at the Tobyhanna house. Officers then showed Jackson the "Dirty Harry" marked drugs and he admitted that it was what he was delivering to the females.

Jackson argues that all of his alleged incriminating statements made during his interview should be suppressed because he invoked his Miranda rights and, because his statements to officers were made after they continued to interrogate him despite "reserv[ing] all [his] rights." Specifically, Jackson argues that he never singed the waiver of Miranda rights form and

---

[3]See Doc. 28-1 transcript and the CD submitted with the government's brief, Doc. 32, "Att. A." Since Jackson's entire interview lasting about one hour is on the CD, the court only provides a brief summary of it for present purposes.

that his statements to the officers, i.e., "I, as a Moorish American National reserve all my rights and I'm here under threat, duress and coercion", were tantamount to invoking his Miranda rights and to wishing to remain silent and not answers the officers' questions. Jackson contends that his reservation of all of his rights, including his right to remain silent, was clear and unambiguous and essentially made without limitation and that the officers were therefore required to stop the interrogation entirely. For support, Jackson cites to Berghuis v. Thompkins, 560 U.S. 370 (2010).

Recently, in United States v. Rought, 11 F.4th 178, 186 (3rd Cir. 2021),[4] the Third Circuit explained:

> To safeguard [the 5th Amendment right against self-incrimination], the Supreme Court in Miranda "imposed certain obligations on police in custodial interrogations, in order to dissipate the 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting Miranda, 384 U.S. at 467, 86 S.Ct. 1602). The familiar Miranda warnings require police to "inform the suspect of his right to remain silent and his right to have counsel present during interrogation, as well as their intent to use his statements to secure a conviction." Id. Police must also "cease the interrogation if at any point the suspect indicates that he wishes to remain silent or that he wants an attorney." Id.

However, the Third Circuit in Rought, *id*. at 183, also explained:

> In Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court held that invocations of [a Miranda right] during custodial interrogations can be "limited." Id. at 529-30, 107 S.Ct. 828. After a limited invocation, interrogation can continue on topics not

---

[4]The precedential decision in United States v. Rought, 11 F.4th 178 (3rd Cir. 2021), was issued by the Third Circuit on August 24, 2021, after the parties filed their briefs in the instant case.

11

covered by the invocation. If the suspect, without prompting from law enforcement, then voluntarily reinitiates discussion of a covered topic and waives her previously invoked [Miranda] rights, it "is quite consistent with the Fifth Amendment" for the suspect's statements about a covered topic to be admissible at trial. Id. at 529, 107 S.Ct. 828.

Here, the government points out, (Doc. 32 at 12), that after Jackson initially reserved his rights as a Moorish American National and then gave "equivocal, ambiguous, and confusing statements regarding his willingness to talk or not to talk with the officers", the following transpired:

> Officers [] attempted to clarify the defendant's statements. In fact, the officer followed the defendant's statement by telling him that he did not understand what he was actually saying, i.e., "I don't know what that means." Never did the defendant expressly state that he did not want to speak to the officers. Never did the defendant ask for or say that he wanted a lawyer. Never did the defendant request that the interview cease. There is no question that the defendant understood his Miranda rights. The defendant's own statement confirmed that understood his rights.

No doubt that "[i]f a suspect who has invoked [one of his Miranda rights] but … initiates discussion with the authorities, further interrogation can take place." *Id*. at 186. "Post-invocation statements made during that interrogation may then be admissible against the suspect at trial if the suspect knowingly and voluntarily waives the right to counsel and the right to remain silent." *Id*. (citations omitted).

There is no dispute that prior to his interview Jackson was in custody and that he was advised of his Miranda rights, including that he had the right to counsel and the right to remain silent before the interview began, and that

12

he could waive those rights as well as his other Miranda rights. However, it is less clear if Jackson was invoking his rights under Miranda or if he was simply reserving some unknown alleged rights as a so-called "Moorish American National", which as noted bears no legal significance regarding the instant criminal proceedings.

In Rought, 11 F.4th at 187, the Court stated that "[a] waiver [of the Miranda rights] is knowing and intelligent if 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" (citing Spring, 479 U.S. at 573, 107 S.Ct. 851 (quoting Burbine, 475 U.S. at 421, 106 S.Ct. 1135); Berghuis v. Thompkins, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)). Further, "[i]f the Government 'shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" Id. (quoting Berghuis, 560 U.S. at 384, 130 S.Ct. 2250).

After reading the briefs and reviewing the evidence, including the excerpt of the transcript from Jackson's interview as well as the entire videoed interview on the CD, the court finds that Jackson's Miranda waiver, prior to making incriminating statements, was voluntary, was knowingly made, and was the result of his deliberate choice. Further, the government met it burden of proving a valid waiver by a preponderance of the evidence. The court also finds that even though Jackson reserved all of his unknown rights as a "Moorish American National" and declined to sign the waiver of

13

Miranda rights form since he only considered himself an authorized representative of "Robert Jackson" and did not want to "autograph" anything, he acknowledged that he understood his Miranda rights that were verbally given to him and, then he indicated that he would "speak my truth" and would voluntarily discuss the incident which lead to his arrest. Indeed, Jackson also understood his other constitutional rights including his 4th Amendment rights and pointed out to the officers during the interview that under the 4th Amendment he had the right to see an arrest warrant and the right to see a search warrant before his cell phone was examined. Thus, even after initially reserving his supposed rights as a Moorish American National, Jackson voluntarily continued the discussion with the officers. "Once there has been an initiation, further interrogation can take place, and the suspect's statements may be admissible against him at trial if he validly waives the right to remain silent and the right to counsel." Rought, 11 F.4th at 187.

Additionally, based on the totality of the circumstances, the court finds that Jackson, through his words and conduct, waived his right to remain silent. "A waiver is generally held to be knowing and voluntary 'if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." Id. at 192 (quoting United States v. Ruiz, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)) (emphasis original). Further, similar to Rought, id., "[t]here is also no basis in the record [i.e., the CD video recording of the interview] for finding

involuntariness." After, Jackson reserved all of his alleged rights as a "Moorish American National", the officers tried to clarify what he meant and one of the officers stated, "I don't know what that means." In short, as in Rought, id., nothing either Scarfo or Orlando "said or did [during Jackson's interview] approaches the kind of law enforcement overreach necessary to render a statement involuntary." As such, the court finds that Jackson "knowingly, intelligently, and voluntarily waived his right to remain silent and his limited invocation [to "reserve all my rights" "as a Moorish American National]." Rought, id. (citing Berghuis, 560 U.S. at 384, 130 S.Ct. 2250; Velasquez, 885 F.2d at 1087-89).

Additionally, there is no evidence that he requested to consult with an attorney before his interview with Scarfo and Orlando at PMRP Headquarters. *See* Whiteford, 676 F.3d at 362 (defendant must make "an objectively identifiable request for counsel" to invoke his Fifth Amendment rights.) (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994)).

Based on the totality of circumstances regarding Jackson's *Mirandized* statements given on July 28, 2020, the court finds that the government has met its burden of establishing Jackson's waiver was valid since it was voluntary and the result of his free and deliberate choice and not the result of threats or coercion or promises. Jackson was fully advised of the rights he was waiving and the consequences of his decision to waive them. Jackson

then verbally acknowledged his rights, and he then voluntarily responded to the officers' questions and made several incriminating statements.

Also, there is no credible evidence that Jackson was coerced by the officers or that the officers forced him into making his statements and answering questions. In fact, the video recording of the interview belies any claim of coercion. As such, the court finds that Jackson's post-Miranda admissions were not coerced and will not be suppressed for trial. Jackson's motion to suppress will be denied in its entirety.

## IV.     CONCLUSION

Based on the foregoing, the court finds that Jackson's statements to the officers during his July 28, 2020 interview were made after he was given Miranda rights, after he knowingly and intelligently waived those rights, and, that he was not coerced to make the statements based on the totality of the circumstances in which he made them. Thus, Jackson's motion to suppress his statements, **(Doc. 27)**, will be **DENIED IN ITS ENTIRETY**. An appropriate order will be issued.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: November 30, 2021**
20-291-01